**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 17-cv-2294-WJM-NYW

STEVE BRITTEN,

      Plaintiff,

v.

MOUNTAIN VIEW ELECTRIC ASSOCIATION, INC.,

      Defendant.

_____

**ORDER GRANTING IN PART AND DENYING IN PART**
**MOTION FOR SUMMARY JUDGMENT**
_____

Plaintiff Steve Britten ("Plaintiff") brings this action against his former employer Defendant Mountain View Electric Association, Inc. ("Defendant" or "Mountain View"), alleging gender discrimination, gender harassment, retaliation, and retaliatory harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the Colorado Anti-Discrimination Act, Colo. Rev. Stat. §§ 24-34-401 *et seq.* ("CADA"), and intentional infliction of emotional distress.[1]

Currently pending before the Court is Defendant's Motion for Summary Judgment (the "Motion") on all claims. (ECF No. 41.) For the reasons set forth below, the Court grants Defendant's Motion as to Plaintiff's claims of gender discrimination (Claim 1),

_____

[1] Plaintiff's counsel filed a Suggestion of Death on April 5, 2019, notifying the Court and Defendant of Plaintiff's death and stating that an appropriate motion to substitute the Estate of Mr. Britten or Plaintiff's wife Kathleen Britten as personal representative would be filed within 90 days of the notice. (ECF No. 65.) Given the upcoming Trial Preparation Conference on June 28, 2019, and jury trial beginning July 15, 2019, the Court directed Plaintiff's counsel to file a motion to substitute on or before June 14, 2019. (ECF No. 67.)

retaliatory discrimination (Claim 3), retaliatory harassment (Claim 4), and intentional infliction of emotional distress (Claim 6), and denies the Motion as to gender harassment (Claim 2) and Defendant's affirmative defense.[2]

## I. BACKGROUND

The following relevant facts are viewed in the light most favorable to the Plaintiff, and are undisputed except where noted.

### A. Plaintiff's Employment at Mountain View

Plaintiff began his employment with Defendant in November 2014 as a Step 4 Apprentice Linemen. (ECF No. 41 at 2, ¶ 1.) At Mountain View, apprentice linemen rotate among the Underground Construction Crew, the Overhead Construction Crew, and the Service Crew. (*Id.* ¶ 2.) Plaintiff rotated onto the Service Crew, the Underground Construction Crew under Foreman Ted Brewer, and, in November 2015, to the Overhead Construction Crew under Foreman Jeremy Greer. (*Id.* ¶¶ 4–5.) The other members of the Overhead Construction Crew were Journeyman Steve McKinney and Apprentice Lance Freml. (*Id.* ¶ 5.) Four months later, Freml left the crew and Apprentice Zebulon Birch rotated onto the Overhead Construction Crew. (*Id.*)

While on the Overhead Construction Crew, McKinney called Plaintiff "sister" on a daily or near daily basis, and Greer occasionally called Plaintiff "sister." (ECF No. 43 at 13, ¶ 1; ECF No. 49 at 7, ¶ 1 (admitted "as to Plaintiff's testimony").) McKinney also called Plaintiff "Felicia." (ECF No. 43 at 13, ¶ 3.) Greer explained that use of "sister," among other familial terms in the workplace, was to create a culture where "the general

---

[2] The Complaint also alleges wrongful discharge (Claim 5) and defamation (Claim 7). In response to the Motion, Plaintiff withdrew these two claims. (ECF No. 43 at 2.)

foreman is the dad and the foremen[] are the uncles and the apprentices are the kids."
(ECF No. 41-11 at 88.)  However, Greer also testified that he understood why a man
would take offense to being called sister.  (*Id.* at 88–89.)

The parties dispute whether the names were directed only at Plaintiff, as well as
the nature of the comments and pranks on the Overhead Line Crew.  Defendant
contends that the term "sister" was used "universally by the Overhead Construction Crew
and was directed at Mr. McKinney and Mr. Birch as well as Plaintiff."  (ECF No. 41 at 5,
¶ 16.)  However, Brewer's deposition makes clear that the terms "sister" and "Felicia"
were occasionally directed at other people, but usually directed at Plaintiff and "it just
seemed like it was more derogatory toward [Plaintiff]."  (ECF No. 43 at 3–4, ¶ 16.)

Plaintiff also contends that McKinney would play practical jokes on him in a way
that was directed at harassing Plaintiff, rather than team-building.  (ECF No. 43 at 6,
¶¶ 22–23.)  Defendant contends that this was part of the workplace culture.  Defendant
cites testimony of Brewer that the work environment of construction—including line
work—differs from an office setting, "entails rough and crude language," and "joking or
ribbing [is] common amongst" employees.  (ECF No. 41 at 5, ¶ 16.)  Brewer also testified
that such joking and pranks can build camaraderie among crews.  (*Id.* ¶ 18.)  Defendant
claims that Greer, McKinney, and Birch all used the term "sister" and it was meant in a
joking way; and that Plaintiff was a voluntary participant in the workplace culture and did
not complain about the language used.  (*Id.* at 6, ¶ 20.)  However, Plaintiff cites
contradictory testimony from McKinney, Greer, and Birch about the uses of various terms,
as well as Plaintiff's involvement in workplace pranks.  (ECF No. 43 at 5, ¶ 20.)

Plaintiff wore jewelry, drove an expensive vehicle, and occasionally wore slim

fitting pants apparently resembling a woman's cut.  (ECF No. 43 at 13, ¶ 5.)  Plaintiff found McKinney and Greer's comments and conduct demeaning, and perceived that McKinney and Greer were harassing him due to his gender because he did not fit into the "good ol' boys club" stereotype.  (*Id.* ¶ 2.)  Others similarly perceived McKinney's conduct as interfering with Plaintiff's job performance.  (*Id.* ¶ 3.)  Indeed, Brewer asked management multiple times to move Plaintiff to a new crew so that he would no longer be bullied and called feminine nicknames, and someone "would actually teach him."  (ECF No. 41-10 at 76.)

Greer raised concerns about Plaintiff's attention to safety to David Lagge (Falcon Operations Superintendent), and on February 16, 2016, Greer, Lagge, Jason Matzke (General Foreman), and Chuck Houghton (Service Area Representative) held a counseling session with Plaintiff to address safety concerns.  (*Id.* at 3, ¶¶ 6–7.)  Plaintiff had previously spoke with Matzke about the Overhead Construction Crew bulling him, and claims that Matzke stated during this meeting that "bullying will not be tolerated."  (*Id.* ¶¶ 8–9.)  On March 3, 2016, Greer, Lagge, and Mike Garland held a second counseling session with Plaintiff about continued safety issues.  (*Id.* at 4, ¶ 12.)  After Garland and Lagge raised safety concerns to Jim Herron (CEO), Plaintiff was put on a performance improvement plan.  (*Id.* at 3, ¶ 10.)

Around that time, Defendant decided to leave Plaintiff on the Overhead Construction Crew to improve his competencies.  (ECF No. 41 at 12, ¶ 33.)  Also at that time, Brewer reported to Garland that the Overhead Construction Crew was "being mean" to Plaintiff because he "wasn't a member of the good ol' boys club."  (*Id.*; ECF No. 41-10

at 75.)  Brewer perceived this as reporting harassment (potentially on the basis of sex) to management, whereas Garland states that Brewer never made any allegations about harassment.  (ECF No. 41-10 at 75–76, 176–77, 175; ECF No. 41-3 at 146.)

## B.    Plaintiff's Termination

During his time on the Overhead Construction Crew, Plaintiff started saying "smile and wave."  Plaintiff testified that this began when Freml was on the crew and continued with Birch, and explained that he started using the phrase "had to laugh it off," referring to his frustrations with the Overhead Construction Crew.  (ECF No. 43 at 10, ¶ 48.)

One day in March 2016, McKinney, Birch, and Plaintiff had a difficult job, and finally reached agreement about how to do it.  (*Id.* ¶ 50.)  Defendant claims that Plaintiff was unable to follow instructions or the agreed-upon plan, resulting in missteps, arguments, and yelling.  (*Id.*)  The crew did a review of what happened.  McKinney claims that Plaintiff then "clicked his heels together, put his hand to his chest, and made his hand flat in the air and said, 'Sieg Heil.'"  (ECF No. 41-12 at 34.)  Plaintiff disputes saying "Sieg Heil," but admits he may have done the Nazi salute at that time.  (ECF No. 41-1 at 261–63.)  Plaintiff stated "just smile and wave, Zeb," referring to Birch.  (ECF No. 41 at 18, ¶ 51; ECF No. 41-14 at 87.)

McKinney asked Birch what Plaintiff meant by "smile and wave," and Birch told McKinney "he's going to shoot you, Steve."  (ECF No. 41-12 at 34-35; *see* ECF No. 41-13 at 88.)  Birch recounted a prior conversation with Plaintiff in the parking lot when Plaintiff allegedly told Birch: "If you ever come to work or if you're leaving work and you see bodies dropping around you, just look up and smile and wave."  (ECF No. 41-13 at 89,

91.) Birch understood Plaintiff to imply that Plaintiff would be standing on top of the building, shooting people in the parking lot. Birch initially thought Plaintiff was "just blowing off steam." (*Id.* at 90.) However, Plaintiff's "tone and his demeanor and the way he acted after saying the comment [to McKinney] led [Birch] to belief that this ha[d] gone past joking or blowing off steam." (*Id.* at 86.)

Plaintiff denies ever having such a conversation with Birch about use of a firearm and the phrase "smile and wave," and flatly asserted in his deposition that Birch was lying. (ECF No. 41-1 at 169.)

McKinney and Birch reported the incident to Defendant's management, specifically Lagge, Garland, and Kristi Hobbs. Hobbs separately met with Birch and McKinney. (ECF No. 41-15 at 112, 114, 123.) Hobbs in turn informed Herron, likely by phone call, of the situation after speaking with Birch. (*Id.* at 120–21.) Hobbs asked Birch and McKinney to write and submit statements, which they did. (ECF No. 19.) Herron reviewed the written statements. (ECF No. 41 at 21, ¶ 59.) At the request of Herron, Hobbs contacted the Mountain States Employers Council for advice. Over the course of several days, Hobbs and Herron spoke several times, with Hobbs presenting facts for Herron's consideration and Herron making the ultimate decision. (ECF No. 41-15 at 121–22.) Because of the severity of the threat, Herron was hesitant to do a full investigation. (*Id.* at 122.)

Herron, the decisionmaker for all terminations at Mountain View, decided to terminate Plaintiff's employment because of Plaintiff's serious, threatening comments. (ECF No. 41 at 21, ¶ 62; ECF No. 41-4 at 88–89.) Herron testified that the combination of Plaintiff's comment about wanting to shoot coworkers from the building's roof and stating "just smile and wave" was "really the foundation of all of it." (*Id.* at 92.)

Plaintiff was terminated in a meeting with Garland, Lagge, and Hobbs at Mountain View on March 29, 2016.  (ECF No. 41 at 22, ¶ 65.)  Herron was out of the office that day, but instructed the staff to move forward with immediate termination.  (*Id.*)  Plaintiff was escorted off the property and informed he was not allowed on any Mountain View property.  Defendant notified all employees of Plaintiff's termination and that Plaintiff was not allowed on Mountain View property.  (ECF No. 43 at 16, ¶ 20.)

Plaintiff cites a report that another employee who showed "signs of a confrontational nature with aggressive behavior" was not disciplined or terminated for his behavior.  (*Id.* ¶ 22.)  Coworkers complained that the employee in question "is allowed to continue to use the sign of raising his middle finger to relay his opinion of his female co-workers to those female co-workers," "bangs on the wall of cubicles while female co-workers are having discussions with other co-workers about company related business," and "has stepped into the personal space of female co-workers and female co-worker[s] [have] feared for their safety."  (ECF No. 43-6 at 6.)

**C.     Defendant's Harassment Policy**

Defendant maintains a harassment policy forbidding workplace harassment on the basis of any protected characteristic, including sex.  (ECF No. 41-14 at 1.)  The policy also directs any employee who has been subjected to harassment to "report the incident immediately to his or her immediate supervisor."  (*Id.* at 2.)  The policy further directs that "[i]f the immediate supervisor is involved in the activity, the incident must be reported to the Chief Executive Officer (CEO) or the Administrative Manager."  (*Id.*)  There is no dispute that Plaintiff knew of the employee handbook which contained the harassment

policy and that he understood the policies in the handbook applied to him.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is " material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is " genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.* , 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat' l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## III. ANALYSIS

Plaintiff contends that Defendant failed to promote Plaintiff and ultimately terminated Plaintiff because of gender stereotypes and in retaliation for engaging in protected activity (Claims 1 & 3). Plaintiff also claims that harassment—both on the basis of gender and for engaging in protected activity—was so severe or pervasive as to alter the terms of Plaintiff's employment and create a hostile work environment (Claims 2 & 4).

Defendant raises an affirmative defense to Plaintiff's Title VII claims. Finally, Plaintiff sets forth a claim for intentional infliction of emotional distress (Claim 6). The Court will address these claims in turn.

**A.      Gender Discrimination and Retaliation (Claims 1 & 3)**

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex," or "to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-2(a)(1); *id.* § 2000e-3(a). "CADA discrimination and retaliation claims are subject to the same legal standards as Title VII claims." *Agassounon v. Jeppesen Sanderson, Inc.*, 688 F. App'x 507, 509 (10th Cir. 2017).

The framework for analyzing claims under Title VII is well established. A plaintiff may either present direct evidence of discriminatory motivation or establish a prima facie case under the familiar *McDonnell Douglas* burden-shifting test. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002); *see Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016) (applying the *McDonnell Douglas* test to retaliation claims). Under the three-step analysis of *McDonnell Douglas*, a plaintiff must first set forth a prima facie case of gender discrimination or retaliation. *Garrett*, 305 F.3d at 1216. If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory basis for its employment decision. *Id.* If the defendant does so, the inference of discrimination drops out and the burden shifts back to

the plaintiff.  *Id.*  At that point, the plaintiff must offer evidence to "show that his race . . . or other illegal consideration was a determinative factor in the defendant's employment decision, or show that the defendant's explanation for its action was merely pretext."  *Id*.

It is undisputed that Defendant terminated Plaintiff's employment, and that Herron made the decision to terminate Plaintiff.  (ECF No. 41 at 21 ¶ 62.)  For purposes of the Motion, the Court will assume that Plaintiff can plead a prima facie case of sex discrimination or retaliation, and will consider only whether Defendant's explanation for termination was pretextual or tinged with impermissible bias.

Defendant states that it terminated Plaintiff for making serious threats of violence to company employees.  Plaintiff contends that he was terminated because of his gender and in retaliation for engaging in protected activity.  For the reasons discussed below, the Court concludes that the decision to terminate Plaintiff was not pretextual or tainted with impermissible discriminatory bias.

A plaintiff may establish pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273 (10th Cir. 2010).  To determine whether evidence of pretext permits an inference of discrimination, the court considers "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered."  *Bennett v. Windstream Commc'n, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015) (quoting *Reeves v. Sanderson*

*Plumbing Prod., Inc.*, 530 U.S. 133, 149 (2000)).  In determining whether a plaintiff has

shown pretext, the Court must consider the plaintiff's evidence in its totality.  *Orr v. City of*

*Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008).

It is undisputed that Herron fired Plaintiff.  There are no allegations that Herron

himself, or anyone else in the human resources department or upper management with

authority to terminate employees, held any discriminatory animus on the basis of sex or in

retaliation for reporting protected activity.[3]  Rather, Plaintiff relies on a theory of

subordinate bias liability—also known as "cat's paw liability"[4]—thereby imputing

_____

[3] Plaintiff contends that another employee made workplace threats, and did not suffer the same consequence of termination.  (ECF No. 43 at 22.)  Plaintiff suggests that Herron made further efforts to investigate the issues with the other employee, and thus alleges that he was treated differently for the same concerns.  However, Plaintiff does not suggest that Herron had any discriminatory animus or motive, and therefore, this inconsistency cannot be used to assert that Herron's reasons for firing Plaintiff were pretextual.  Moreover, the nature of the threats allegedly made by Plaintiff and by the other employee are sufficiently different in nature so as to merit different responses by the Defendant.  Plaintiff's alleged threats were sufficiently severe that Herron determined that an investigation would be risky to employees.

[4] The Tenth Circuit explains,

> The "cat's paw" doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire.  *See* Fables of La Fontaine 344 (Walter Thornbury trans., Chartwell Books 1984).  As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat.  *Id.*  Today the term "cat's-paw" refers to "one used by another to accomplish his purposes."  Webster's Third New International Dictionary Unabridged 354 (2002).  In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.

*E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006).  The doctrine is also known as "subordinate bias" liability or "rubber stamp" liability.  "The 'rubber stamp' doctrine has a more obvious etymology, and refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly

McKinney's alleged bias to Herron.

Under the "cat's paw" liability theory, an employer may be liable for discrimination "where certain biased subordinates have directly affected the actions of an unbiased decision-maker." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 912 (10th Cir. 2011). "To prevail on a subordinate bias claim, a plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process. Rather, [a plaintiff must show] the biased subordinate's discriminatory reports, recommendation, or other actions *caused* the adverse employment action." *Jordan v. Dillon Cos.*, 2015 WL 4126952, at *3 (10th Cir. 2015) (citations omitted) (emphasis in original).[5]

The unbiased employer's independent investigation will not automatically break the causal chain, because the "purportedly independent judgment may still rely on facts provided by the biased supervisor." *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 796 (10th Cir. 2014) (citation and quotation marks omitted). *Cf. Ward*, 772 F.3d at 1205 (explaining that to survive summary judgment on a "cat's paw" theory of liability, plaintiff must show that the same individuals—there, subordinates recommending an action that was later adopted—both harbored bias and had "influence in the decision-making

---

recommended by a biased subordinate." *Id.*

[5] Defendant argues that the "cat's paw theory of liability is inherently inconsistent with the but-for causation standard required for Title VII retaliation claims adopted by the Supreme Court," citing *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338, 360 (2013). Defendant is incorrect. After *Nassar*, the Tenth Circuit extended the but-for causation requirement to causation under cat's paw liability: "To establish causation where, as here, a Title VII retaliation claim is based on the cat's-paw theory, a plaintiff must demonstrate that the biased subordinate was a 'but-for' cause of the adverse action." *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 517 (10th Cir. 2015). Moreover, other Tenth Circuit cases suggest that biased reports must be the proximate cause of a complaining party's termination. *Hysten*, 415 F. App'x at 912.

process"). However, this is not the case when the employer "independently verifies the facts and does not rely on the biased source." *Lawrence*, 560 F. App'x at 796. "In short, an employer is not liable under a subordinate bias theory if the employer did not rely on any facts from the biased subordinate in ultimately deciding to take an adverse employment action—even if the biased subordinate first alerted the employer to the plaintiff's misconduct." *Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1295 (10th Cir. 2013).

Plaintiff cannot use cat's paw liability to impute bias to Herron. For purposes of analysis, the Court presumes that McKinney was biased and fabricated or exaggerated his allegations against Plaintiff. McKinney was not, however, the sole source of the report of threats of violence that lead to Plaintiff's termination. Birch corroborated the story, and indeed is the direct source for the explanation of Plaintiff's "smile and wave" comments. (ECF No. 41-13 at 89, 91.) Absent the context provided by Birch, McKinney would not have had reason to suspect that Plaintiff's "smile and wave" comment was threatening.

Notably, Plaintiff does not allege that Birch harbored any discriminatory animus to Plaintiff. (ECF No. 41 at 4, ¶ 14; ECF No. 43 at 3, ¶ 14.) Herron therefore relied on the statements of a non-biased observer when he fired Plaintiff. Indeed, Herron testified that it was Birch's statement regarding the context of Plaintiff's "smile and wave" comments that was determinative in his decision to terminate Plaintiff. (ECF No. 41-4 at 88–89.) Reviewing Birch's report about Plaintiff's remarks is sufficient independent investigation such that Herron did not rely on the statements of an allegedly biased supervisor. Plaintiff has not presented any reason why Herron could not rely on the statement of a non-biased individual when he decided to terminate Plaintiff.

13

Plaintiff argues that Birch called him the day of termination to "assert that he was made to write the statement and that he knew Plaintiff would never do such a thing." (ECF No. 43 at 21.)  He also emphasizes Birch's deposition testimony that he was more concerned about his life from Plaintiff's safety violations than his threat.  Plaintiff thus claims that there is a "genuine issue for trial as to the genuine belief in the threat."  (ECF No. 43 at 21.)  However, comparative concern is irrelevant, and Birch's deposition reveals only that he was not concerned that Plaintiff would return and attack *him* specifically, in part because of Plaintiff's comment that he would not hurt Birch.  (ECF No. 41-13 at 159.)

Birch confirms talking with Plaintiff after his termination, and explaining that "we were asked to write statements . . . and I told them the truth."  (ECF No. 41-13 at 145–46.)  The evidence cited by Plaintiff does not raise a question whether Herron, the decisionmaker, genuinely believed that Plaintiff had made a serious threat of workplace violence.  Nor does Plaintiff present any evidence beyond his own belief that Birch made a coerced statement, or fabricated or exaggerated Plaintiff's comments.  Absent such evidence, no reasonable jury could conclude that Herron erred in relying on Birch's statements.

The Court is also not persuaded that Defendant's failure to interview Plaintiff prior to his termination suggests that Herron failed to conduct an independent investigation.  A disturbing procedural irregularity that occurs in the context of an adverse employment action may indicate that an employer's alleged nondiscriminatory reasons are pretextual.  *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007).  However, an employer's failure to obtain an employee's side of the story prior to termination does not necessarily suggest pretext, even though it may be the employer's standard investigative

14

practice to do so. *Cooper*, 296 F. App'x at 696; *see also Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) ("Although allowing [the plaintiff] to complete her side of the story would seem to be the most fair way of addressing the situation, we cannot say that [her supervisor's] failure to do so in these circumstances constitutes a 'disturbing procedural irregularity' sufficient to prove pretext."). In addition, Plaintiff has not identified any written policy that required Defendant to interview him prior to his termination.

"[A] challenge of pretext requires [the Court] to look at the facts as they appear to the person making the decision to terminate plaintiff . . . [and] [a] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (citations and internal quotation marks omitted); *see also Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("[O]ur role is . . . not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."). Thus, the harassment by, and bias of, Plaintiff's coworker cannot be imputed to the ultimate decisionmakers on these facts, and does not suggest that Defendant's stated reasons for termination were pretextual or otherwise unworthy of belief.

The Court accordingly concludes that while McKinney's report certainly started the ball rolling, it was not the proximate cause of Plaintiff's termination. Indeed, McKinney had only heard secondhand from Birch what Plaintiff meant when he repeated "smile and wave." Plaintiff has failed to establish subordinate bias liability or prextext, and the Court therefore grants summary judgment in Defendant's favor on Plaintiff's gender discrimination and retaliation claims (Claims 1 & 3).

**B.      Hostile Work Environment (Claims 2 & 4)**

To establish a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998) (citations and internal quotation marks omitted). "A discriminatory and abusive environment must affect the employee's work environment so substantially as to make it intolerable for her to continue . . . ." *Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 170 (10th Cir. 1996). "The mere utterance of a statement which "'engenders offensive feelings in an employee' would not affect the conditions of employment to a sufficient[ly] significant degree to violate Title VII." *Gross v. Burggraf Construction Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

In determining whether an actionable hostile work environment existed, the Court must consider "all the circumstances," *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002), viewed through the perspective of a reasonable person in a plaintiff's position, *Montes v. Vail Clinic Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007). In addition, a plaintiff must also "subjectively perceive the environment to be abusive," thereby altering the conditions of employment. *Id.*; *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) ("The applicable test for a hostile work environment has both objective and subjective components."). There is no "mathematically precise test" for a hostile work environment claim. *Hernandez*, 684 F.3d

at 958.  Instead, courts look to factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id*.  "The severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact."  *Id*.

In *Hernandez*, the Court—while emphasizing that pervasiveness is not a counting test—found that a dozen racial comments made over a fourteen month period was enough to raise a genuine issue of material fact on the issue of pervasiveness.  *Id.* at 957–59; *see also Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1415 (10th Cir. 1997) (evidence of six sexually derogatory statements over twenty-three months, some repeated frequently, was sufficient to support a finding of pervasive harassment).

The plaintiff must also show that the discrimination occurred because of his gender or other protected characteristic.  *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998).  "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."  *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994).

1.    Gender Harassment

The Tenth Circuit has noted that a number of courts have expressly recognized a Title VII cause of action "for discrimination based on an employee's failure to conform to stereotypical gender norms."  *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir.

2007); *see also Klen v. Colorado State Bd. of Agric.*, 2007 WL 2022061, at *16 (D. Colo. July 9, 2007) (concluding that the Tenth Circuit would allow a plaintiff to use sex-stereotyping as an evidentiary route to prove same-sex harassment if squarely presented with the question). And "the Tenth Circuit has implicitly recognized that claims based on failure to conform to stereotypical gender norms may be viable." *Smith v. Avanti*, 249 F. Supp. 3d 1194, 1200 (D. Colo. 2017).

Plaintiff claims that McKinney treated him differently for his failure to conform to stereotypical gender norms. Plaintiff asserts that McKinney frequently referred to him as "sister" and "Felicia" during his five month tenure on the Overhead Construction Crew, and did not use such gendered language to refer to other crew members. Defendants characterized the supervisors' comments as merely reflecting an alleged "family" workplace environment on the Overhead Construction Crew. (ECF No. 41-11 at 88.) Plaintiff, however, contends that these comments were in reaction to his perceived femininity by coworkers, resulting from his skinny jeans, earrings, and nice car. (ECF No. 43 at 13 ¶ 5.) Plaintiff further contends that in Defendant's workplace culture, being female or having feminine characteristics were synonymous with the being less than a man. (ECF No. 43 at 17–19.) Plaintiff also contends that he suffered more initiation-type games or pranks than others because of this perceived difference. (*Id.*)

Defendant heavily cites *Gross*, which instructs courts to examine a plaintiff's work environment in evaluating gender discrimination and harassment claims. (ECF No. 41 at 25–27.) *Gross*, 53 F.3d at 1537. *Gross* counsels that "in the real world of construction work, profanity and vulgarity are not perceived as hostile or abusive. Indelicate forms of

expression are accepted or endured as normal human behavior." *Id.*[6]  However, belittling someone on a daily basis on the basis of perceived differences and gender stereotypes is not mere "hostile or abusive" language or an "indelicate form of expression" that must be tolerated in any work environment, even in the construction industry.  *See Gross*, 53 F.3d at 1537.  Rather, it may be evidence of severe or pervasive discriminatory conduct that creates a hostile work environment.

When the circumstances are viewed in their totality, a reasonable jury could find that they amounted to more than "run-of-the-mill boorish, juvenile, or annoying behavior" and that the actions were both objectively offensive and subjectively offensive to Plaintiff. *See Morris v. City of Colorado Springs*, 666 F.3d 654, 663 (10th Cir. 2012).  Plaintiff has presented evidence of nearly daily comments comparing him to a woman during his time on the Overhead Construction Crew.  He also has alleged specific facts to support his claim that he was subjected to dangerous pranks designed to humiliate him because of this perceived difference.  A reasonable jury could also conclude that Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of his employment and create an abusive

---

[6] Other circuits have outright rejected the reasoning in *Gross*, recognizing that taken to its extreme, it would eviscerate Title VII harassment claims provided that the employer could prove that the workplace culture was sufficiently vulgar prior to anyone raising a harassment claim.  *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999) ("We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment; indeed, we find this reasoning to be illogical, because it means that the more hostile the environment, and the more prevalent the sexism, the more difficult it is for a Title VII plaintiff to prove that sex-based conduct is sufficiently severe or pervasive to constitute a hostile work environment.  Surely women working in the trades do not deserve less protection from the law than women working in a courthouse."); *O'Rourke v. City of Providence*, 235 F.3d 713, 735 (1st Cir. 2001) (relying on *Williams* to reject the conclusion of *Gross*).

working environment." *Herrera*, 474 F.3d at 680 (internal quotation marks omitted).

Therefore, the Court denies summary judgment as to Plaintiff's hostile work environment

claim based on gender (Claim 2).

    2.    <u>Retaliatory Harassment</u>

Plaintiff also asserts that Defendant created a hostile work environment in

retaliation for Plaintiff reporting gender harassment.  (ECF No. 1 ¶¶ 99–107.)  However,

there is a dearth of facts in the record to support a retaliatory harassment claim.  In the

argument section of the brief, Plaintiff states that "both he and Brewer heard McKinney or

Greer saying things that clearly indicated their knowledge and disapproval of the

complaints made by and on behalf of Plaintiff."  (ECF No. 43 at 26.)  He also contends

that there is "genuine dispute of material fact that they called Plaintiff 'narc' or said things

like 'Oh, I bet management's going to hear about this.'"  (*Id.*)  However, Plaintiff does not

cite where in the record there is any evidence that McKinney or Greer made such

statements.  Nor do Plaintiff's or Defendant's statements of material fact reference any

such statements.

In general, isolated, non-severe incidents are insufficient to show a hostile work

environment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Here, there are

no allegations that such allegedly retaliatory comments were pervasive, rather than

merely offhand, occasional comments.  Nor are the comments so serious that a single

incident is sufficient to show a severely discriminatory work environment.  *See Lowe v.*

*Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1175 (10th Cir. 1996) (one isolated comment

and the use of the term "girlie" for a female employee "although regrettable, do not

demonstrate that the work environment . . . was 'permeated with discriminatory

intimidation, ridicule, and insult'"). In short, there is no evidence, much less sufficient evidence from which a reasonably jury could conclude, of the pervasiveness or severity of such alleged retaliatory statements to support a retaliatory harassment claim. The Court therefore grants summary judgment in favor of Defendant on Plaintiff's claim of retaliatory harassment (Claim 4).

## C.    Defendant's Affirmative Defense

Plaintiff alleges that his supervisors created a hostile work environment due to Plaintiff's perceived non-conformance with gender stereotypes. Defendant raises an affirmative defense under the *Faragher-Ellerth* doctrine that Plaintiff failed to follow the Mountain View Employee Harassment Policy. (ECF No. 41 at 31.) *See Faragher*, 524 U.S. at 807–08; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762–63 (1998) ("*Ellerth*").

An employer can be vicariously liable for a hostile work environment created by a supervisor even where the hostile work environment does not culminate in a "tangible employment action," such as hiring, firing, failure to promote, reassignment, or significant change in benefits. *See Penn. State Police v. Suders*, 542 U.S. 129, 143-46 (2004). In that circumstance, the employer will not be liable if it proves the *Faragher-Ellerth* affirmative defense by a preponderance of the evidence: (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *see also Faragher*, 524 U.S. at 807. The employer must support its motion with credible evidence, and demonstrate that no disputed material fact exists regarding the affirmative defense

asserted.  *Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 746 (10th Cir. 2014).  "Even on undisputed facts, however, the judgment call as to reasonableness is itself a jury issue unless no reasonable jury could decide it in the plaintiff's favor."  *Id.* (internal quotation marks omitted).

Defendant maintains an employee harassment policy that prohibits harassment on the basis of sex or any other status protected by law, and directs any employee subject to harassment to report the incident immediately to his direct supervisor, or alternatively the CEO (Herron) or Administrative Manager (Cheinette Van Wyk) .  (ECF No. 41-14 at 1.)  Defendant states that "Plaintiff did not follow any of the options outlined by this policy," and it is thus entitled to summary judgment in its favor on its affirmative defense.  (ECF No. 41 at 31–32.)  However, "failure to complain formally . . . is simply not dispositive of the affirmative defense's second prong . . . .  It is not enough for the [employer] to simply show that [the plaintiff] did not complain; it must show that [his] failure to do so was unreasonable under the circumstances."  *Kramer*, 743 F.3d at 746.

Defendant's only fact supporting its claim that Plaintiff *unreasonably* failed to take advantage of the policy is that Plaintiff failed to make a complaint under the policy.  Defendant adduces no additional facts to show that Plaintiff's failure was unreasonable.  Nor does Defendant address Plaintiff's justifications for not reporting under the policy.  (ECF No. 49 at 16–17; *see* ECF No. 43 at 23.)  Defendant has not demonstrated that Plaintiff's failure to report under the policy was unreasonable as a matter of law, and thus "the judgment call as to reasonableness is itself a jury issue."  *See Kramer*, 743 F.3d at 746.  The Court thus denies the Motion on Defendant's affirmative defense.

**D.      Intentional Infliction of Emotional Distress**

Plaintiff also asserts a claim of intentional infliction of emotional distress ("IIED")—also known as outrageous conduct—alleging that Defendant's actions went beyond all bounds of decency, were extreme and outrageous, and done with the intent to cause Plaintiff severe emotional distress.  (ECF No. 1 ¶¶ 115–119.)  *See Atsepoyi v. Tandy Corp.*, 51 F. Supp. 2d 1120, 1124 (D. Colo. 1999).  To support his claim, Plaintiff points to the "constant barrage of gendered harassment, firecrackers in the workplace, general bullying, retaliation . . . , termination for a false threat in which all employees at Mountain View were notified that [Plaintiff] could no longer be on property and rumors that he had threatened to shoot people from a rooftop."  (ECF No. 43 at 28.)

An IIED claim under Colorado law requires a showing that: "(1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; (3) causing the plaintiff to suffer severe emotional distress."  *Maiteki v. Marten Transp. Ltd.*, 4 F. Supp. 3d 1239, 1256 (D. Colo. 2013) (quoting *Han Ye Lee v. Colo. Times, Inc.*, 222 P.3d 957, 966–67 (Colo. App. 2009)). "[T]he level of outrageousness required to create liability is extremely high."  *Id.* (quoting *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003)).  "[T]he defendant's conduct must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct."  *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 383 (10th Cir. 1988); *Culpepper v. Peart St. Bldg., Inc.*, 877 P.2d 887, 882 (Colo. 1994) ("Outrageous conduct . . . go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." (internal quotation

marks omitted).)  "[M]ere discharge of an employee, without more, does not support a claim for outrageous conduct," but evidence of "invidious discrimination and denigrating employer behavior" may support an IIED claim.  *Atsepoyi*, 51 F. Supp. at 1125.

"Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question."  *Culpepper*, 877 P.2d at 883; *see Grandchamp*, 854 F.2d at 383.

Here, Plaintiff has produced no evidence that Defendant *intended* to cause him emotional distress or that Defendant acted recklessly in terminating him and informing employees that Plaintiff was no longer allowed on Defendant's property.  *See Culpepper*, 877 P.2d at 833 ( "A triable issue of fact would exist if there were evidence that the defendant[ ] engaged in outrageous conduct with the specific intent of causing severe emotional distress of that the defendant[ ] acted recklessly with the knowledge that there was a substantial probability that [its] conduct would cause severe emotional distress.").  As discussed above, Herron terminated Plaintiff for making threats against his coworkers, and Defendant informed all employees that Plaintiff had been terminated and was not allowed on Defendant's property.  (ECF No. 43 at 16, ¶ 20.)  Plaintiff does not allege, much less support with evidence, that Defendant denigrated Plaintiff or fueled any workplace rumors.  In addition, Plaintiff's claims of workplace harassment, although potentially pervasive enough for him to prevail on this claim before a jury, are not egregious enough for any reasonable juror to find that they constitute outrageous conduct of the nature and degree required by the controlling case law.  *See Pascouau v. Martin*

*Marietta Corp.*, 185 F.3d 874 (10th Cir. 1999) (concluding that "sexually explicit, immature, and rude" comments were not egregious enough to be "outrageous conduct").

Even viewing the evidence most favorable to Plaintiff, a reasonable jury could not find that Defendant's conduct was so outrageous as to meet the legal threshold for such claims. The Court therefore grants summary judgment in favor of Defendant on Plaintiff's IIED claim (Claim 6).

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant's Motion for Summary Judgment (ECF No. 41) is GRANTED in favor of Defendant as to Plaintiff's claims for gender discrimination (Claim 1), retaliation (Claim 3), retaliatory harassment (Claim 4), and intentional infliction of emotional distress (Claim 6);

2. Defendant's Motion for Summary Judgment (ECF No. 41) is DENIED as to Plaintiff's gender harassment claim (Claim 2) and Defendant's affirmative defense; and

3. This matter REMAINS SET for Trial Preparation Conference on June 28, 2019, at 2:00 p.m., and a 5-day jury trial starting on July 15, 2019, at 8:30 a.m., both in Courtroom A801.

Dated this 13th day of June, 2018.

BY THE COURT:

_____
William J. Martínez
United States District Judge